**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GENERAL CITRUS INTERNATIONAL INCORPORATED,** | ) ) ) | |
| **Plaintiff** | ) ) | **No. 04 C 6402** |
| **v.** | ) ) | **Hon. Michael T. Mason** |
| **JEROME REMIEN, THE JEROME REMIEN REVOCABLE TRUST, BURTON URY, and URY CORP.** | ) ) ) ) | |
| **Defendants** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff General Citrus International Incorporated ("General Citrus") filed this underlying case against Jerome Remien ("Remien") and the Jerome Remien Revocable Trust dated June 13, 1989 (the "Remien Trust") (collectively the "Remien Defendants"), and against Burton Ury ("Ury") and Ury Corporation ("Ury Corp.") (collectively the "Ury Defendants"), seeking sums due under a loan agreement and related guaranty. Ury Corp. filed a counterclaim against General Citrus for a declaratory judgment that Ury Corp. is entitled to payment from Remien before General Citrus receives payment, and a cross claim for judgment against Remien.

Presently before the Court is General Citrus' motion for summary judgment on the issue of liability with respect to Counts I and III and Ury's counterclaim; the Ury Defendants' motion for summary judgment in their favor on Count III and on Ury Corp.'s counterclaim; and the Remien Defendants' motion for summary judgment on Counts I and II. For the reasons stated below, General Citrus' motion for judgment against

Remien on the issue of liability for breach of contract is granted in part, and the Remien Defendants' motion for judgment in Remien's favor on the breach of contract claim is denied. The Remien Defendants' motion for summary judgment on General Citrus' claim for breach of fiduciary duty is granted. General Citrus' motion and the Ury Defendants' cross motion for summary judgment on General Citrus' claim for tortious interference are denied. Finally, the Ury Defendants' motion for judgment as a matter of law on their counterclaim and request for declaratory relief are also denied.

## I.    BACKGROUND FACTS[1]

General Citrus was originally known as Avoco International Corporation ("Avoco"). In 2001, Avoco changed its name to Barranca Brown Corporation ("Barranca") and in 2004 Barranca became General Citrus. These entities are collectively referred to as General Citrus throughout this opinion.

In 1995, General Citrus' shareholders were Brown International Corporation ("Brown") and CalFlo Corporation ("CalFlo"). Scott Alexander ("Alexander")[2] owned 80% of Brown's stock and served as Brown's president and chairman of the board. Alexander owned 100% of CalFlo's stock. From 1995 to 1999, Alexander served as General Citrus' president and as a member of its board of directors. In 2001, Alexander was General Citrus' chief executive officer.

---

[1]Unless otherwise stated, these are taken from the parties' statement of material facts pursuant to Local Rule 56.1.

[2]The stipulated facts involving Alexander are set forth in the Remien Defendants' statement of facts. Unless otherwise stated, General Citrus does not dispute each asserted fact. Because the Remien Defendants' motion is against General Citrus, the Ury Defendants have not responded to these factual assertions.

General Citrus' primary business concerned the sale of avocado products.  In early 1999, General Citrus decided to sell certain assets through an asset sale or stock sale.  Alexander testified that the management team would be involved in the sale, but "ultimately it would be [his] decision."

In early 2001, General Citrus contracted to sell certain business assets to Avoco International LLC ("AI LLC").  The record before this Court does not identify the asset purchase price.  General Citrus and the Remien Defendants stipulate that AI LLC was an Illinois Limited Liability Company formed on February 5, 2001 and involuntarily dissolved on July 31, 2006.  The Ury Defendants admit that Ury and Remien, along with other non-parties, formed AI LLC in 2001.  Ury contributed $500,000 toward the company's initial capitalization.  Remien and the Remien Trust – which is controlled by Remien – also contributed capital toward AI LLC.

In connection with its purchase of General Citrus' assets, AI LLC arranged to borrow money from LaSalle Bank, N.A. ("LaSalle").  General Citrus admits that its majority shareholder, Alexander, understood that LaSalle would finance the asset purchase.  Alexander also understood that LaSalle might have its own terms and conditions, separate and apart from General Citrus', regarding the financing of the asset purchase.   Alexander testified that he "became aware that there would be guarantees needed  . . .  LaSalle would require guarantees from the buyers."  The financing available from LaSalle would not cover the entire asset purchase price.  Therefore, the parties discussed an arrangement under which AI LLC would pay the remaining balance of the purchase price back to General Citrus in installment payments.  Alexander was aware that LaSalle wanted General Citrus to subordinate the debt owed by AI LLC to

LaSalle's debt. Alexander testified that the guaranty General Citrus negotiated with Remien would "be subordinated to the credit that the bank was giving." Alexander objected to the subordination, but ultimately acceded to it.

From August 1999 through the closing of the transaction in February 2001, Alexander discussed the terms and conditions of the subordination with representatives from LaSalle. In his deposition, Alexander characterized the dispute as follows: "We wanted to be able to receive payments that were owed to us. And the bank wanted to restrict those, so we objected." Alexander's discussions with LaSalle ended when LaSalle "basically laid out what the document requirements were going to be and said this is the way they would lend the money if that's going to be the deal."

To document the borrowing arrangement, AI LLC and LaSalle entered into a "Loan Agreement" dated February 9, 2001. Pursuant to the Loan Agreement, LaSalle agreed to provide AI LLC with a revolving credit of up to $2,000,000 and a secured term loan in the principal amount of $750,000. AI LLC and LaSalle amended the notes executed in connection with the Loan Agreement (collectively the "LaSalle Notes") at various times. The most recent amendments to the LaSalle Notes are the "Third Amended and Restated Term Note" and "Fifth Amended and Restated Revolving Note." In their briefing and in various documents filed with the district court, the parties refer to AI LLC's debt with LaSalle as the LaSalle Notes and, alternatively, as the "Senior Indebtedness." Alexander understood that General Citrus could not receive payment until the Senior Indebtedness was paid in full.

Ury executed a guaranty in favor of LaSalle of up to $1 million of the debt owed by AI LLC to LaSalle under the LaSalle Notes (the "Ury Guaranty"). The Ury Guaranty

4

provides that:

**GUARANTOR HEREBY IRREVOCABLY WAIVES ANY RIGHT GUARANTOR MAY HAVE OR ACQUIRE BY WAY OF SUBROGATION UNDER THIS GUARANTY BY ANY PAYMENT MADE HEREUNDER OR OTHERWISE AND ANY RIGHT OF REIMBURSEMENT OR CONTRIBUTION AGAINST BORROWERS WHICH GUARANTOR MAY HAVE IN CONNECTION THEREWITH.**

(*bold in original*).  General Citrus is included in the definition of "Borrowers."

AI LLC also financed its purchase of the assets through a term loan from General Citrus.[3]  The term loan included an installment payment arrangement between AI LLC and General Citrus, documented in a subordinated secured note dated February 9, 2001 (the "General Citrus Note").  Pursuant to the General Citrus Note, as amended, General Citrus loaned AI LLC $1,473,500.[4]  The General Citrus Note contains a subordination clause which states that the payment of all amounts due "are subordinate, subject to and made junior to the rights of LaSalle  . . .  its successors and assigns, in the manner and extent set forth in that certain Subordination Agreement."

General Citrus, AI LLC, Remien, Ury and other non-parties executed the aforementioned subordination agreement (the "Subordination Agreement") on February 9, 2001.  Alexander executed the Subordination Agreement in his capacity as the CEO of the creditor, General Citrus.  He reviewed the agreement prior to signing.  Ury did not

---

[3]The Remien Defendants contend that "AI LLC's purchase [of] these assets was financed not just through a combination of bank debt from LaSalle ... and a term loan from General Citrus but also from a down payment from AI LLC."

[4]The record before the Court contains two related copies of the General Citrus Note. One is signed by Remien in his capacity as trustee of the Remien Trust and is in the amount of $1,473,500.  The second is also signed by Remien in his capacity as trustee, and is in the amount of $1,800,000.  Attached to the second note is a red-line version of the same, which shows edits, reflected in the first copy, reducing the note amount from $1,800,000 to $1,473,500 and changing various provisions subsequent to Remien's signature.

read the entire Subordination Agreement before signing, although he "most likely read at least part of the document." At the time he executed the Ury Guaranty and the Subordination Agreement, Ury was an experienced businessman with a background in private investments. Ury received his MBA, worked as an accountant for a public accounting firm and as the manager of a corporation, and has been engaged in handling private investments for the past 25 years.

Pursuant to paragraph one of the Subordination Agreement, AI LLC's debt to General Citrus is subordinate to the Senior Indebtedness, and General Citrus "agrees not to accept any payment on account of the Subordinated Debt . . . or to assign its claim . . . or to enforce any of its rights under the [Note and any related documents] until such time as the Senior Indebtedness has been satisfied and paid in full." The Subordination Agreement provides that General Citrus shall not commence any action against the borrower (AI-LLC) or guarantors (Remien and Ury) "until all of the Senior Indebtedness has been satisfied and paid in full." Finally, the agreement states, in paragraph five, that:

> Notice by Creditor of Defaults, Etc. In addition to any other notices required hereunder, [General Citrus] shall give written notice to [LaSalle] promptly upon the occurrence of any event which triggers the obligation of [General Citrus] to [AI LLC] under the Creditor Loan Documents. The foregoing notice obligation shall be provided by [General Citrus] to [LaSalle] concurrently with any notice provided by [General Citrus] to [AI LLC].

By its terms, the Subordination Agreement terminates when the Senior Indebtedness "has been fully paid, satisfied and performed." Also on February 9, 2001, AI LLC signed a Subordinated Security Agreement in favor of General Citrus (the "Security Agreement").

On February 9, 2001, Remien executed a guaranty of AI LLC's obligations to LaSalle, including obligations pursuant to modifications of or amendments to the LaSalle Notes, not to exceed $1,000,000 (the "Remien Guaranty"). The Remien Guaranty contains the following provision:

> [LaSalle] shall not enforce its remedies under this Guaranty until it has used commercially reasonable efforts to pursue its remedies against Burton Ury ("Ury") under that certain Guaranty by Ury . . . (the "Ury Guaranty"), which efforts shall include commercially reasonable efforts to satisfy the Guaranteed Indebtedness by marshaling of the assets of Ury . . . .

Therefore, the Remien Guaranty obligates LaSalle to pursue its remedies against Ury before pursuing Remien. The "period during which [LaSalle] is required to use commercially reasonable efforts to pursue its remedies against Ury" is defined as the "Stand Off Period." The Remien Guaranty provides that during the Stand Off Period, Remien may not "take any action with respect to his assets or otherwise [act] to hinder [LaSalle's] ability to enforce payment . . . [which includes] to deplete or dispose of [his] assets outside the ordinary course, make preferential payments to other creditors . . . outside the ordinary course, or to otherwise defraud [LaSalle] out of payment." In the event LaSalle elects to sell, assign or transfer the Remien Guaranty, any assignee "shall have the right to enforce th[e] Guaranty." Finally, the Remien Guaranty provides that "[n]o action of [LaSalle] permitted hereunder shall in any way affect or impair the rights of [LaSalle] and the obligation of [Remien] under this Guaranty."

Remien also executed a guaranty in favor of General Citrus on the General Citrus Note (the "Remien Subordinate Guaranty"). The Remien Subordinate Guaranty, executed on February 9, 2001, contains a "Guaranty Limitation" of $500,000.

Remien ("Guarantor") hereby unconditionally and irrevocably, guarantees the full

and prompt payment in an amount not to exceed Five Hundred Thousand and no/100 Dollars ($500,000)("Guaranty Limitation") to [General Citrus] at maturity, whether by acceleration or otherwise, up to the Guaranty Limitation of amounts owed to [General Citrus] by [AI LLC] ("Borrower") pursuant to [the General Citrus Note], or any modifications thereto plus all expenses, legal and/or otherwise, (including court costs and reasonable attorneys' and paralegals' fees and expenses), paid or incurred by [General Citrus] in endeavoring to enforce or collect the indebtedness owed to [General Citrus] under the [General Citrus] Note or this Guaranty, or any part thereof, or in defending any suit based on any act or omission of [General Citrus] with respect to the [General Citrus] Note or this Guaranty in an amount not to exceed the Guaranty Limitation (collectively, the "Guaranteed Indebtedness").

General Citrus disputes that sums incurred in enforcing or collecting upon the indebtedness owed by AI LLC or by Remien under the Remien Subordinate Guaranty, including legal expenses and statutory interest, are capped within the $500,000 Guaranty Limitation. General Citrus and the Remien Defendants stipulate that the General Citrus Note, Security Agreement and Remien Subordinate Guaranty all state that they are junior and subordinate to the rights of LaSalle as set forth in the Subordination Agreement.

AI LLC defaulted on its obligation to LaSalle. On or before July 21, 2003, and as a result of the non-payment, LaSalle retained an attorney, Martin Salzman ("Salzman"), to pursue collection of the Senior Indebtedness. The record does not indicate the amount of default in July 2003.

AI LLC also defaulted on its obligations to General Citrus. General Citrus sent a demand letter to AI LLC, dated January 7, 2004, stating that AI LLC is in default under the General Citrus Note for the entire unpaid principal amount of $1,473,500. General Citrus contends that the letter is a valid demand for immediate payment of the General Citrus Note and all accrued and unpaid interest. After General Citrus sent the demand

letter, Remien did not make any payment to General Citrus of the sums due under the General Citrus Note. Moreover, Remien is not aware of any payments made by AI LLC to General Citrus of sums owed pursuant to the General Citrus Note after January 2004.

AI LLC liquidated most of its assets to pay down its debt in the months preceding March 2004. Nevertheless, by March 2004, AI LLC owed approximately $850,000 under the LaSalle Notes. At that time, LaSalle approached Ury, through Salzman, to pay the balance pursuant to his guaranty of the Senior Indebtedness. Ury was aware that AI LLC was in default and did not dispute his obligation to pay LaSalle pursuant to the Ury Guaranty. In fact, Ury testified that there was "never a doubt in [his] mind that [he] would honor the guaranty."

From March through May 2004, Ury discussed with Brian Sullivan ("Sullivan"), a representative of LaSalle, the fact that in May 2004 LaSalle would require Ury to pay the amounts owed by AI LLC. It is undisputed as to General Citrus and the Ury Defendants that Ury did not attempt to negotiate payment of an amount less than the entire Senior Indebtedness. In late March 2004, Ury came up with the idea of creating a corporation to provide payment to LaSalle. Ury also decided that LaSalle should assign the LaSalle Notes to the corporation. LaSalle was aware that by virtue of the proposed assignment, Ury intended to "step into its shoes," thereby "keeping the LaSalle Notes alive" so that Ury could proceed against Remien. LaSalle had no objections to Ury's idea.

Ury was not represented by counsel at the time he came up with the idea of creating a corporation, having the corporation pay LaSalle and having LaSalle make the assignment to the corporation. Ury believed that this idea would "prolong things" and

"was a more businesslike way of doing things." Ury's family was unaware that he had personally guaranteed such a large sum, and Ury believed it would be better to set up a corporation to pursue collection of the LaSalle Notes.

On March 30, 2004, Sullivan consulted Salzman, in his capacity as counsel for the bank, for advice as to whether the proposed assignment would be problematic. The Remien Defendants dispute the purpose of the consultation, but admit that Sullivan contacted Salzman about the assignment. The following week, on April 6, 2004, Sullivan instructed Salzman to draw up documents assigning the Senior Indebtedness to Ury. Salzman prepared the first draft of an assignment agreement the next day. In preparing the first draft of the assignment, Salzman was acting in his capacity as LaSalle's attorney.

In April 2004, at Sullivan's request, Ury placed $800,000 of his own funds in an account at LaSalle. It is undisputed as to General Citrus and the Ury Defendants that Ury made the deposit in order to secure his commitment to honor the Ury Guaranty. However, the Remien Defendants contend the reason was not to secure Ury's commitment under the guaranty, but to "post collateral."

Around that time, Ury approached Salzman to represent him with respect to the assignment. Ury testified that he had a letter from Salzman and "called him up on the phone and said would you represent me and would you prepare the documents or facilitate preparing the documents to assign the note." Salzman did not discuss any potential conflicts with Ury. Salzman testified that he could not remember if he cleared his representation of Ury with Sullivan. However, because LaSalle would be paid what it was owed, Salzman did not perceive any conflict in representing both LaSalle and Ury

in the transaction.

Salzman then arranged for the formation of Ury Corp. On May 7, 2004, Salzman filed an application with the Illinois Secretary of State for the incorporation of Ury Corp. Salzman's paralegal prepared the application on May 6, 2004. Salzman also prepared an application for a federal tax ID number on or around May 14, 2004. That application identifies Ury as the executor or trustee of Ury Corp. Finally, Salzman arranged to open a LaSalle bank account in Ury Corp.'s name.

On May 20, 2004, the LaSalle Notes remained in default. At that time, AI LLC owed LaSalle approximately $795,894.74, which it was unable to pay. In keeping with Ury's decision to have a corporation "pay off the bank debt," LaSalle and Ury Corp. entered into an assignment agreement (the "Assignment") under which Ury Corp. paid LaSalle $795,894.74 in exchange for the assignment of the Senior Indebtedness. Defendants contend that Ury Corp. and LaSalle executed the Assignment on May 20, 2004. General Citrus disputes this date.

Remien had no knowledge of the Assignment until after LaSalle executed the agreement. Neither LaSalle nor the Ury Defendants requested Remien's permission for LaSalle's assignment of the Senior Indebtedness to Ury Corp. It is undisputed that Ury never discussed the Assignment with Remien. In fact, no one discussed the proposed assignment with Remien until after the Assignment occurred. However, General Citrus alleges that in May 2004, Sullivan had daily conversations with an executive employed by AI LLC which may have included discussions of the Assignment.

On May 21, 2004, Ury authorized LaSalle to transfer the sum of $789,999.78[5] -
which was the full amount of the outstanding Senior Indebtedness owed by AI LCC -
from Ury's personal account into the LaSalle account set up in the name of Ury Corp.
Ury further authorized debiting the Ury Corp. account in that same amount and on that
same date "to Payoff the referenced Loans." The letter by which Ury authorized the
fund transfers and debits was prepared on LaSalle letterhead under Sullivan's direction.
Ury's signature appears under the heading "payoff authorization." The letter identifies
Ury as an "authorize[d] signer" for his personal account and the Ury Corp. account.
Some of LaSalle's contemporaneous internal records identify the sums debited from Ury
Corp.'s account as a "Pay-off" of the principal and interest owned on the LaSalle Notes,
rather than an "assignment of those notes." The Ury Defendants contend that LaSalle's
system did not provide a way to indicate an assignment of an obligation, rather than a
payment of the obligation.

General Citrus contends that the Assignment is not a valid contract. General
Citrus characterizes the Assignment as "a sham" under which Ury paid off the Senior
Indebtedness under the auspices of a closely-held corporation created solely for that
purpose. Defendants contend that the Assignment is a valid agreement supported by
adequate consideration which effectively transferred LaSalle's rights as senior creditor
of the Senior Indebtedness to Ury Corp. The Assignment states that "for and in
consideration of the sum of Ten Dollars ($10.00) and other good and valuable

---

[5]The record before this Court does not explain how AI LLC's debt to LaSalle was
reduced from $850,000 in March 2004 to $795,894.74 on or before May 20th, or from
$795,894.74 on May 20th to $789,999.78 on May 21st.

consideration, the receipt and sufficiency of which are hereby acknowledged," LaSalle transferred a group of "Loan Documents to Ury Corp." The record does not contain any undisputed facts demonstrating that Ury Corp. actually paid the aforementioned $10.00. General Citrus avers that Ury Corp. did not pay anything for the Assignment other than the $789,999.78 transferred from Ury's account to Ury Corp.'s account and then debited by the Bank pursuant to Ury's instructions. The Ury Defendants do not contest General Citrus' assertion. However, in paragraph 25 of their Answer, they deny that "Ury Corp. paid no consideration for the Assignment Agreement."

On June 1, 2004, Ury transferred $10,654.29 from his personal account to the Ury Corp. account. Five weeks later, on July 7, 2004, Ury transferred approximately $10,000 from the Ury Corp. account back to his personal account. Ury made these transfers by calling LaSalle and directing the bank to "move this money." There are no loan documents or corporate resolutions accounting for the fund transfers.

Ury is and was Ury Corp.'s sole officer, director and shareholder. Ury testified in his individual capacity and as the Fed. R. Civ. P. 30(b)(6) designee for Ury Corp. During that deposition, Ury stated that Ury Corp. has not purchased any other distressed loan or held any assets other than the LaSalle Notes. Ury further acknowledged that, aside from the acquisition of the LaSalle Notes, Ury Corp. did not engage in any actions, acts, purchases and/or contracts during the period from May 2004 to May 2005, and has not engaged in any activity since that time. Ury Corp. filed its 2004 tax returns for the first time in October 2007, after the commencement of discovery in this case. It has not filed returns for 2005 or 2006, and has not obtained an extension for its late tax returns. When asked why Ury Corp. did not file the returns, Ury

testified that it was because he had not filed his personal returns.  Ury Corp. never sought to collect the Senior Indebtedness from Ury.  General Citrus and the Remien Defendants stipulate that "Ury Corp. has only collected $70,000 since the acquisition of the LaSalle Note[s]."  The record before this Court does not include any additional details regarding Ury Corp.'s purported collection of $70,000, and thus the circumstances surrounding such payment(s) cannot be determined.  The Remien Defendants have no interest in Ury Corp. and Remien has never been an officer, director, shareholder or employee of Ury Corp.  Ury did not have any discussions with Remien concerning the formation of Ury Corp., the payment by Ury Corp. to LaSalle or the Assignment.

General Citrus filed this action on October 4, 2004, after unsuccessful efforts to obtain payment from Remien under the Remien Subordinate Guaranty.  The initial complaint consisted of a single count for breach of contract against Remien.  In response, Remien filed a motion to dismiss on the grounds that the Senior Indebtedness had not been retired, but rather had been assigned to Ury Corp.  After the district court denied that motion, Remien filed his answer denying the contract claim. However, Remien admitted that AI LLC was in default to General Citrus and admitted that he had not made any payments to General Citrus under the Remien Subordinate Guaranty.  In that answer, and in his answer to subsequent complaints, Remien avers that General Citrus has not met its burden of establishing that it has fulfilled all condition precedents under the guaranty.

On August 24, 2006, General Citrus filed its Second Amended Complaint (the "Complaint"), the operative complaint in this case.  In the Complaint, General Citrus

asserts the following claims: against Remien for breach of the Remien Subordinate Guaranty (Count I); against Remien and the Remien Trust for breach of fiduciary duties (Count II); and against Ury and Ury Corp. for tortious interference with the Remien Subordinate Guaranty (Count III). Ury Corp. filed a counterclaim against General Citrus, seeking a declaration that the Assignment is legal, valid and enforceable, and that Ury Corp. is entitled to payment of the LaSalle Notes from Remien to the extent of the Remien Guaranty before General Citrus receives any payment from Remien under the Remien Subordinate Guaranty.

Ury Corp. also filed a crossclaim against Remien, seeking to recover $795,894.54,[6] plus costs, attorneys' fees and interest. Remien does not dispute that the LaSalle Notes are in default, nor does he dispute the validity of the Assignment. However, Remien denies any obligation to pay Ury Corp. the sums that Ury Corp. claims are owed to it pursuant to Remien's guaranty of the Senior Indebtedness. Remien asserts that his obligation is not ripe because Ury Corp. has not used commercially reasonable efforts to first collect those sums from Ury.

After General Citrus commenced this case, Salzman, in his capacity as Ury's attorney, continued to pursue efforts to obtain reimbursement of the sums paid by Ury Corp. on the Senior Indebtedness from Remien. On October 28, 2004, Salzman sent a letter to Remien's attorney, Allen Shapiro ("Shapiro"), proposing that Remien reimburse Ury "$612,000 as the pro rata portion of his obligation under his Guaranty." Salzman's

_____

[6]It is undisputed that Ury Corp. paid LaSalle $795,894.74. Based on the present record, this Court cannot determine if Ury Corp. intentionally requested $795,894.54, rather than $795,894.74, or if the 20 cent differential is the result of a typographical error.

letter states that the proposed resolution would "not affect the outstanding indebtedness to [General Citrus] so that Mr. Remien may continue to have such defenses [as] may be available to him in his pending litigation."  In September 2006, Salzman informed Shapiro that Ury Corp. would "sell the note to Jerry" (Remien) for $300,000.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, along with any affidavits, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986)).  The movant bears the burden of establishing the absence of issues of material fact and right to judgment as a matter of law.  *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (*citations omitted*).  In determining whether there is a genuine issue of fact, the court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the nonmoving party. *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986)).  To avoid summary judgment, the non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient to show a genuine issue of material fact."  *Weeks v. Samsung Heavy Indus. Co. Ltd.*, 126

F.3d 926, 933 (7th Cir. 1997) (*citing Anderson*, 477 U.S. at 252).

By filing cross-motions for summary judgment, parties do not waive their right to a trial on the merits. *Market St. Assoc. Ltd. P'ship v. Frey*, 941 F.2d 588, 590 (7th Cir. 1991). A court is not required to grant summary judgment as a matter of law for either side when faced with cross-motions for summary judgment. *See id.* Rather, the court is to evaluate each motion on its merits, resolving factual uncertainties and drawing all reasonable inferences against the movant. *Brownlee v. City of Chicago*, 983 F.Supp. 776, 779 (N.D. Ill. 1997).

## III.   LEGAL ARGUMENT

The Remien Defendants and General Citrus have filed cross motions for summary judgment on General Citrus' claim for breach of contract due to Remien's failure to pay his obligations under the Remien Subordinate Guaranty. The Remien Defendants admit that General Citrus demanded payment, and that Remien has not made any payment to General Citrus. However, the Remien Defendants claim that they are entitled to judgment because of the outstanding condition precedent under the Subordination Agreement and Remien Subordinate Guaranty. *See Heritage Bank & Trust Co., v. Abdnor*, 906 F.2d 292, 297 (7th Cir. 1990) (defining a condition precedent, in part, as a condition "which is to be performed before some right dependent thereon accrues") (*citations omitted)*. It is undisputed that the Subordination Agreement incorporates a condition precedent - namely that General Citrus shall not commence any action against the Remien "until all of the Senior Indebtedness has been satisfied and paid in full." The Remien Subordinate Guaranty provides that the payment of amounts due and enforcement of remedies provided for therein are "subordinate,

17

subject to and made junior to the rights of LaSalle . . . its successors and assigns . . . to the extent set forth in that certain Subordination Agreement." The Remien Defendants rely on these provisions in contesting General Citrus' demand for payment.

General Citrus avers that Ury Corp. is Ury's alter ego, and Ury satisfied the condition precedent when he "paid-off" LaSalle. Therefore, General Citrus argues that there is no impediment to Remien's satisfaction of his obligations under the Remien Subordinate Guaranty. General Citrus asks this Court to disregard Ury's attempts to recast the transaction as an arm's-length negotiation between LaSalle and Ury Corp. and find Remien liable for his refusal to provide payment under the Remien Subordinate Guaranty. General Citrus further argues that the Assignment was a "sham transaction" that must be set aside because it is not supported by adequate consideration.

We begin with General Citrus' request to pierce Ury Corp.'s corporate veil and find that Ury Corp.'s payment to LaSalle paid off the Senior Indebtedness such that the Remien Subordinate Guaranty is now ripe.

### A.    Piercing the Corporate Veil

As a general rule, a corporation is "a legal entity that exists separately and distinctly from its shareholders, officers, and directors, who generally are not liable for the corporation's debts." *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 775 (Ill. App. Ct. 2005); *accord Browning-Ferris Indus. of Illinois, Inc. v. Ter Maat*, 195 F.3d 953, 959 (7th Cir. 1999) ("The general rule, of course, in Illinois as elsewhere, is that a shareholder . . . is not liable for a corporation's debts.") "[A] court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity." *FieldTurf Int'l, Inc. v. Triexe*

18

*Mang. Group Inc.*, 2004 U.S. Dist. LEXIS 6676, *15 (N.D. Ill. Apr. 14, 2004) (*quoting Peetoom v. Swanson*, 778 N.E.2d 291, 295-96 (Ill. App. Ct. 1992)).  Whether to pierce the corporate veil is a matter of the trial court's discretion.  *See, e.g. International Fin. Servs. Corp. v. Chromas Tech. Corp.*, 356 F.3d 731, 737 (7th Cir. 2004) (holding that in Illinois, corporate veil-piercing is an equitable remedy to be determined by the court); *Crum v. Krol*, 425 N.E.2d 1081,1089 (Ill. App. Ct. 1981) (concluding that the trial court did not abuse its discretion in treating an individual and his corporation as a single entity).  Parties seeking to pierce the corporate veil face a daunting hurdle.  *Rehabcare Group East, Inc. v. Certified Health Mgmt.*, 2007 U.S. Dist. LEXIS 82952, *6 (N.D. Ill. Nov. 8, 2007) (*quotations omitted*).  Corporate formalities will not be disregarded "except when clearly justified by the circumstances presented in each case."  *Froehlich v. J.R. Froehlich Mfg. Co.*, 416 N.E.2d 1134, 1137 (Ill. App. Ct. 1981).

General Citrus has not alleged any reliance on Ury Corp. or put forth any evidence demonstrating that it entered into any agreements with Ury Corp.  The Remien Defendants argue that General Citrus lacks standing to assert that Ury Corp. is Ury's alter ego because piercing the corporate veil is "limited to protecting those who have relied on the existence of a distinct corporate entity."  *Semande v. Estes*, 871 N.E.2d 268, 271 (Ill. App. Ct. 2007) (affirming dismissal of creditor's complaint on the grounds that the creditor, a director of the corporation, had no standing to pierce the corporate veil).  Here, Remien relies on Ury Corp. as a shield from liability.  General Citrus alleges that it has been injured by Remien's reliance.  Under these circumstances, there is nothing that prevents this Court from considering General Citrus' request to pierce the corporate veil.  *See, e.g. Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 626 (7th Cir.

2000) (reasoning that there is nothing to prevent using the concept of piercing the corporate veil to defeat a defense to suit in order to "accomplish elementary justice"); *Crum v. Krol*, 425 N.E.2d 1081, 1088 (Ill. App. Ct. 1981) (noting that "the same equitable considerations of preventing injustice should apply when it is a third party, rather than a shareholder or officer, who attempts to use the corporate entity as a shield.")

A corporate identity may be disregarded and the corporate veil pierced where: (1) there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences. *Fontana*, 840 N.E.2d at 776; *Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co.*, 826 F.2d 725, 728 (7th Cir. 1987). To determine whether a unity of interest or ownership exists, reviewing courts consider a number of factors including: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders. *Fontana*, 840 N.E.2d at 778 (*citing Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 664 N.E.2d 328, 331 (Ill. App. Ct. 1996)). No single factor is determinative. *State of Illinois v. V&M Indus.*, 700 N.E.2d 746, 751 (Ill. App. Ct. 1998).

Application of these factors establishes a unity of ownership between Ury and Ury Corp. It is undisputed that Ury is Ury Corp.'s sole officer, director and shareholder. Ury Corp.'s acquisition of the LaSalle Notes coincided with LaSalle's demand that Ury honor his obligations under the Ury Guaranty. The Ury Defendants have judicially admitted that Ury had no defense to LaSalle's demand. They also concede that Ury transferred the sums paid by Ury Corp. from his personal account on the same day Ury Corp. paid LaSalle. Ury transferred funds between his bank account and that of the corporation without any accompanying loan documents or corporate resolutions accounting for the transfers, thereby indicating a failure to observe corporate formalities and a commingling of funds. Ury Corp. filed its 2004 tax returns for the first time in October 2007, after the commencement of discovery in this case. Aside from the formation documents executed in May 2004 and Ury's 2004 tax returns, there is no indication that Ury Corp. has any corporate records.

The Ury Defendants failed to put forth any facts showing that Ury Corp. is anything other than Ury's business conduit for fulfilling his obligation to LaSalle under the Ury Guaranty. There is no evidence that Ury Corp. has engaged in any activities since the Assignment, or engaged in any actions, acts, purchases and/or contracts unrelated to the acquisition of the LaSalle Notes and this underlying case. Ury Corp. has not purchased any other distressed loan or held any asset other than the LaSalle Notes. Finally, there is no indication that Ury Corp. ever attempted to collect the Senior Indebtedness from Ury himself, as would be expected if Ury Corp. were, in fact, a distinct entity.

Despite their failure to set forth specific facts which count against a unity of

interest between Ury and Ury Corp., both the Remien Defendants and the Ury Defendants' claim that the undisputed facts are insufficient to support the application of the alter ego theory. The Ury Defendants also rely on *Froehlich*, an Illinois appellate case reversing the trial court's finding that an officer was personally liable to a creditor for the indebtedness of a corporation. 416 N.E.2d 1134. The *Froehlich* court found the defendant's extensive control over a corporation did not support piercing the corporate veil where "no showing was made that his personal interests or ownership of property coincided with the assets of the corporation," and there was no evidence that the defendant "was personally indebted to the corporation or that he owned any of its assets." *Id.* at 1138. That is not the case here. General Citrus has set forth specific facts demonstrating that Ury's personal interests coincided with Ury Corp.'s purchase of the LaSalle Notes. The case at bar is comparable to *State Bank v. Benton*, 317 N.E.2d 578 (Ill. App. Ct. 1974), a case distinguished by the *Froehlich* court. *See* 416 N.E.2d at 1137 (distinguishing *Benton*). In *Benton*, the Illinois Appellate Court found the defendant individually liable as the alter ego of a corporation where he owned a supermajority of the company's stock, was the only person authorized to sign agreements for the corporation, and used the corporate entity for his personal benefit to the exclusion of creditors. 317 N.E.2d at 580. *See also Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 521-22 (7th Cir. 1991) (concluding that the first prong was satisfied where plaintiff demonstrated such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer existed).

The Remien Defendants focus their opposition on the second prong of the piercing the corporate veil test, which requires the reviewing court to find that adherence

to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences. *See, e.g, Fontana*, 840 N.E.2d at 781. The Remien Defendants argue that General Citrus knew that LaSalle could assign the Senior Indebtedness, and that LaSalle's assignee could manage the loan without any regard for General Citrus' rights. The Subordination Agreement authorizes LaSalle "to manage and supervise the Loans . . . without regard to the existence of any rights of [General Citrus]." It further states that the agreement shall inure to the benefit of the parties "and their respective successors and assigns." Apparently, the Remien Defendants expect this Court to infer that LaSalle's ability to freely assign the LaSalle Notes establishes that there could be nothing unjust or inequitable in the purported assignment to Ury Corp. Even assuming, as we must for purposes of summary judgment, that General Citrus "entered into the transaction with its eyes wide open," that does not preclude a finding of some element of unfairness akin to fraud or deception in Ury's assertion that Ury Corp. is a distinct, separate legal entity, and in Remien's related reliance on the Assignment to avoid his obligations under the Remien Subordinate Guaranty.

In *Sea-Land,* the Seventh Circuit reversed the entry of summary judgment in favor of the plaintiff on the grounds that the plaintiff failed to present evidence to support a finding that adherence to a separate corporate existence would promote fraud or injustice. 941 F.2d at 524. Mistakenly believing that it was enough to satisfy the summary judgment standard, the plaintiff only presented evidence of an unsatisfied judgment. *Id.* The Seventh Circuit instructed the trial court to require, on remand, that plaintiff establish some wrong beyond a creditor's inability to collect. *Id.* The court

reasoned that the plaintiff could demonstrate his right to judgment as a matter of law by showing unjust enrichment, use of the corporation as a facade to avoid responsibilities to creditors, intentional asset and liability shifting, or that former partners would be permitted to skirt the legal rules concerning monetary obligations. *Id.* at 524-25; *see also Wachovia Sec. LLC v. Jahelka*, 586 F. Supp. 2d. 972, 1012 (N.D. Ill. 2008) ("Actual fraud is not a necessary predicate to piercing the corporate veil; limited liability may be discarded to prevent injustice or inequitable consequences.").

Here, General Citrus has set forth specific facts demonstrating that Ury's use of Ury Corp. as the ostensible assignee of the LaSalle Notes promotes injustice and permits Ury and Remien to skirt the rules concerning the obligations they incurred in connection with AI LLC's purchase of General Citrus' assets. Among other things, General Citrus has set forth specific facts demonstrating that LaSalle received all that it bargained for pursuant to the LaSalle Notes and Subordination Agreement, and that the Ury Defendants paid nothing for the Assignment beyond the sums that Ury was already obligated to pay under the Ury Guaranty. Ury Corp. provided payment with funds transferred from Ury's personal account. General Citrus also persuasively argues that it would be unjust to "allow Ury to repudiate the anti-subrogation clause of his Guaranty to unjustly advance the priority of his claim against Remien above General Citrus'." Accordingly, the evidence before this Court demonstrates that, under these circumstances, allowing Ury and Remien to rely on the facade of Ury Corp. would be unjust. *See Fontana,* 840 N.E.2d at 781-82 (affirming piercing of corporate veil); *see also K.C. Pharm., Inc. v. Strieter*, 2006 U.S. Dist. LEXIS 24032, *20-21 (S.D. Ill. Mar. 20, 2006) (granting plaintiff's motion for summary judgment and piercing the corporate

veil where corporation was "a mere facade" for its only shareholder). Therefore, the competent evidence before this Court demonstrates that General Citrus has met its burden to show that Ury Corp. is Ury's alter ego.

## B.     Validity of the Assignment

Next, General Citrus argues that the Assignment is a "sham transaction" and must be disregarded. All defendants contend that the Assignment is a valid, legally enforceable agreement. The Remien Defendants rely on the Assignment to shield Remien from liability. They seek summary judgment on General Citrus' claim for breach of contract on the grounds that General Citrus cannot attempt to collect on the Remien Subordinate Guaranty until LaSalle's assignee, Ury Corp., is paid in full. The Ury Defendants ask this Court to enter judgment in their favor on General Citrus' claim for tortious interference and to affirm the validity of the Assignment. The Ury Defendants also seek a declaration[7] that the LaSalle Notes remain outstanding, and that Ury Corp. is entitled to payment from Remien of the amount due pursuant to the LaSalle Notes, not to exceed $1,000,000, before General Citrus receives any payment.

An assignment occurs "when there is a transfer of some identifiable interest from the assignor to the assignee." *Stilwell v. First Mid-Illinois Bank & Trust*, 500 F. Supp. 2d 1021, 1028 (C.D. Ill. 2007) (*citations omitted*). "Assignments are governed by contract law, and an assignment is subject to the same requisites for validity as are other contracts, such as intent, mutuality of assent, capacity to contract, legal subject matter,

---

[7]As discussed above, Ury Corp. filed a crossclaim against Remien seeking judgment in the amount of $795,894.54, plus interest, costs and attorneys' fees. Despite the Ury Defendants' request for a declaration of Remien's liability, Ury Corp. did not file a motion for summary judgment on its crossclaim.

and consideration." *U.S. Neurosurgical, Inc. v. City of Chicago*, 2006 U.S. Dist. LEXIS 97659, * 20 (N.D. Ill. Mar. 21, 2006) (*citing Northwest Diversified, Inc. v. Desai*, 818 N.E.2d 753, 761 (Ill. App. Ct. 2004)). General Citrus argues that the Assignment lacks consideration because the only sum paid for the Assignment was Ury's pre-existing debt under his guaranty. *See, e.g., Keene Corp. v. Int'l Fidelity Ins. Co.*, 736 F.2d 388, 392 (7th Cir. 1984) ("Under Illinois contract law, the performance by the obligor of an act which it already is required by contract to perform is not sufficient consideration to establish a new agreement."); *DiLorenzo v. Valve & Primer Corp.*, 807 N.E.2d 673, 679 (Ill. App. Ct. 2004) ("The preexisting duty rule provides that where a party does what it is already legally obligated to do, there is no consideration because there has been no detriment") (*quotations omitted*). The Ury Defendants concede that Ury Corp. paid the full outstanding balance of the Senior Indebtedness to LaSalle, and that Ury was already required to provide payment of that amount pursuant to the Ury Guaranty. This Court has already found that Ury Corp. is Ury's alter ego. Accordingly, payment of Ury's outstanding debt is not sufficient consideration for a new agreement. *See id.*

The Ury Defendants argue that the lack of consideration for the Assignment is irrelevant. Relying on the Illinois Court of Appeal's decision in *Northwest Diversified*, 818 N.E.2d at 763, the Ury Defendants claim "[a]n assignment can be gratuitous, and a gratuitous assignment does not require consideration." The Ury Defendants' reliance on *Northwest Diversified* is misplaced. That court noted that under the Restatement of Contracts §149, "there are two kinds of assignments: 'assignments for value' and 'gratuitous' assignments." *Northwest Diversified,* 818 N.E.2d at 763. An assignment for value requires consideration, while a gratuitous assignment "does not require

consideration because it involves the receipt of a gift or inheritance." *Id.* Nothing in the record suggests that the Assignment is a gratuitous one. Therefore, contrary to the Ury Defendants' argument, *Northwest Diversified* holds that in order to be valid, the Assignment must be supported by valuable consideration. *Id.* at 763-64 (*citations omitted*).

To avoid summary judgment, the Ury Defendants must show some consideration for the Assignment beyond that which Ury was already obligated to pay pursuant to the Ury Guaranty. The Assignment itself states that LaSalle transferred various loan documents, including the LaSalle Notes, Ury Guaranty, and Remien Guaranty, to Ury Corp. in consideration for $10.00 "and other good and valuable consideration." However, the Ury Defendants do not set forth any specific facts showing payment of the aforementioned $10.00 or demonstrating that Ury Corp. provided any consideration other than performance of Ury's pre-existing obligation. The Ury Defendants allege that Ury Corp. paid $789,999.78 in exchange for the Assignment. Ury had an obligation to provide payment for up to $1,000,000 of the Senior Indebtedness pursuant to the Ury Guaranty, and payment of $789,999.78 was due at the time LaSalle and Ury Corp. entered into the Assignment. The Ury Defendants have not put forth any competent evidence of consideration for the modification of Ury's obligation through the Assignment. Accordingly, General Citrus' request to find that the Assignment lacked consideration is granted, and the Ury Defendants' request for a declaration that the Assignment is a valid, legally enforceable agreement is denied. *See Thomas v. CitiMortgage, Inc.*, 2006 U.S. Dist. LEXIS 55716, *9-10 (N.D. Ill. July 24, 2006) (holding that "defendant is entitled to summary judgment because plaintiff has failed to put forth

27

evidence of consideration"); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 2003 U.S. Dist. LEXIS 10562, *13-18 (N.D. Ill. June 19, 2003) (granting summary judgment in favor of cross-claimant where plaintiff did not establish any consideration for modification of pre-existing obligation).

### C.    Breach of Contract

This Court's finding that Ury Corp. is Ury's alter ego and that the Assignment is invalid due to a lack of consideration does not, in and of itself, establish General Citrus' right to judgment as a matter of law on its claim against Remien.  Remien has no interest in Ury Corp., and he has never been an officer, director, shareholder or employee of Ury Corp.  There is no competent evidence that Remien was involved in the formation of Ury Corp., the payment by Ury Corp. to LaSalle or the Assignment.  This Court does not find that, at the time he refused payment, Remien knew or should have known the facts presently before us concerning the relationship between Ury and Ury Corp.  Nor do we find that Remien's reliance on payment of the Senior Indebtedness as a condition precedent was unreasonable, or that, prior to this ruling, Remien could not assert any defense to General Citrus' demand for payment.  Those issues are not properly before us.  Accordingly, in granting General Citrus' request to find as a matter of law that Ury Corp. is Ury's alter ego, this Court does not find that Remien is liable for damages dating back to the purported Assignment.  Rather, we find that Remien's obligations under the Remien Subordinate Guaranty are ripe at least as of the date of this opinion.[8]  Consistent with this holding, General Citrus' motion with

---

[8]The Remien Defendants request summary judgment on the ground that General Citrus failed to fulfill the notice requirements set forth in paragraph five of the Subordination

respect to Count I is granted in part and Remien's motion is denied.

### D.    Tortious Interference

Next, we consider the cross motions for summary judgment on Count III of the Complaint, which states a claim for tortious interference with contract against the Ury Defendants.  In order to establish tortious interference with contract, a plaintiff must prove: "(1) the existence of a legally enforceable contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3)  defendant's intentional and unjustified inducement of the third party to breach the contract; (4) subsequent breach by the third party resulting from defendant's wrongful conduct; and (5) damages suffered by the plaintiff as a result of the breach."  *Strosberg v. Brauvin Realty Servs., Inc.*, 691 N.E.2d 834, 845 (Ill. App. Ct. 1998) (*citations omitted*).  The first two elements are not in dispute.  General Citrus argues that the evidence before this Court establishes its right to judgment as a matter of law on the remaining elements because: (1) Ury deliberately entered into the "sham" Assignment in an effort to enhance his claims against Remien; (2) Ury acted to the disadvantage of General Citrus, and with the knowledge that Remien would rely upon the Assignment to contend that a condition precedent to the Remien Subordinate Guaranty had not been met; and (3) as a result of Ury's actions Remien did, in fact, refuse to provide payment due under the Remien Subordinate Guaranty.

The Ury Defendants contend that the undisputed facts do not support a finding of tortious interference, but rather establish that General Citrus cannot maintain its claim.

---

Agreement.  Due to the limited nature of this Court's ruling, we do not reach this issue.

The Ury Defendants assert that Illinois law does not recognize interference with a condition precedent as the basis for a tortious interference claim, and therefore they are entitled to judgment as a matter of law. *See Strosberg*, 691 N.E.2d at 845 (holding that in order to establish intentional interference with contract "there must be evidence of a breach of contract caused by the defendant."). The District Court previously held, in connection with the denial of the Ury Defendants' motion to dismiss, that a claim for tortious interference could be supported by interference with a condition precedent to a contract. The Ury Defendants now dispute this proposition. Relying on *Strosberg*, defendants argue that "the Ury Defendants have not interfered with a contract, because Remien has not breached his contract so long as the LaSalle Notes have not been cancelled." In its opposition, General Citrus persuasively argues that *Strosberg* is not controlling. The *Strosberg* court found the plaintiff could not assert a right to repayment because the evidence, viewed in a light most favorable to the plaintiff, did not show that he possessed the note at issue. *Srosberg,* 691 N.E.2d at 845-46 (reasoning that the plaintiff could not establish the breach element of his tortious interference claim). These facts are not present here. Accordingly, we reject the Ury Defendants' request to reconsider the District Court's prior ruling and hold that General Citrus cannot maintain a claim for tortious interference because there has been no breach of contract. *See Miller v. St. Charles Condo Ass'n*, 491 N.E.2d 125, 128 (Ill. App. Ct. 1986) (denying defendant's motion for summary judgment based on reasonable inference that defendant may have acted to prevent plaintiff from obtaining contractual condition).

Next, the Ury Defendants argue that there is no evidence that the Assignment prevents Remien's compliance with the Remien Subordinate Guaranty. As the Ury

Defendants recognize in their motion, a plaintiff may recover for interference where the defendant prevents performance of a contract or causes performance of the contract to be impossible. *See, e.g., Havoco of Am. Ltd. v. Sumitomo Corp. of Am.,* 971 F.2d 1332, 1344 (7th Cir. 1992). The Ury Defendants claim General Citrus cannot show they prevented Remien's performance because Remien had the financial means to provide payment under the Remien Subordinate Guaranty.

This Court assumes, for the purposes of summary judgment, that since AI LLC's demand Remien's net worth has exceeded his exposure under the Remien Subordinate Guaranty. However, we cannot determine how Remien's net worth establishes, as a matter of law, that the Assignment did not prevent his performance. The Remien Defendants allege, in connection with the pending motions, that Remien refused to provide payment because he believed that his obligation was not ripe until LaSalle's purported assignee, Ury Corp., collected the Senior Indebtedness from Ury. At a minimum, this allegation creates a question of fact that precludes judgment as a matter of law in the Ury Defendants' favor. The Ury Defendants' argument that there can be no question of fact because General Citrus "acknowledged that if Remien has sufficient assets to satisfy its claims and those of Ury Corp. . . . it has not been harmed by the Assignment" is equally unpersuasive. To support this alleged waiver, the Ury Defendants rely on General Citrus' response to the Remien Defendants' motion to quash. In that brief, General Citrus states that if Remien has the financial means to satisfy the claims of both parties, "the issue of which party's claim is superior is moot." Contrary to the Ury Defendants' characterization, this statement does not show that General Citrus has not been harmed by the Assignment.

The Ury Defendants also assert that Ury's conduct is privileged because he "took action to protect his rights . . . and cannot be held financially liable for the result of his actions." *Petit v. Cuneo*, 7 N.E.2d 774, 777 (Ill. App. Ct. 1937); *see also Williams v. Shell Oil Co.*, 18 F.3d 396, 402 (7th Cir. 1994) ("Illinois courts have recognized a privilege in intentional interference with contract cases when the defendant acts to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights") (*quotations omitted*). The Ury Defendants aver that "Ury's sole purpose in requesting and obtaining the Assignment was so that he could attempt to recoup some or all of the money paid to LaSalle." They further claim that Ury entered into the Assignment "because his family was unaware that he had personally guaranteed such a large sum, and he thought it would be much more businesslike if he set up a corporation." General Citrus disputes Ury's characterization of his actions, as well as the availability of the asserted privilege.

This Court cannot conclusively determine, based on the present record, how Ury expected to recoup the money paid to LaSalle in connection with the Assignment. The Ury Defendants argue that Ury had a right to recoup funds from Remien pursuant to the Remien Guaranty. They do not cite any specific provisions of the Remien Guaranty, or any other document, that would allow Ury Corp. to recoup the funds it paid from Remien without first utilizing commercially reasonable efforts to collect from Ury. The Ury Defendants further allege that Ury had suretyship status and "when Ury satisfied his guaranty, he took over LaSalle's claim against Remien." However, the Ury Defendants neglect to provide specific factual support for this allegation. Perhaps as a result of the Ury Defendants' failure to adequately address this issue, General Citrus also neglects to

set forth facts demonstrating that the Assignment did not advance Ury's economic interests. In the absence of a complete record, we must conclude that there is a question of material fact that precludes summary judgment on General Citrus' tortious interference claim. Accordingly, the cross motions for judgment as a matter of law on Count III are denied.

### E.    Breach of Fiduciary Duty

Finally, the Remien Defendants seek summary judgment on General Citrus' claim for breach of fiduciary duty against Remien and the Remien Trust. General Citrus does not oppose this motion. *See, e.g. Wachovia Sec., LLC v. Neuhauser*, 528 F.Supp.2d 834, 853 (N.D. Ill. 2007); *Puleo v. Topel*, 856 N.E.2d 1152 (Ill. App. Ct. 2006). Accordingly, the Remien Defendants' motion for summary judgment on Count II of General Citrus' Complaint is granted

## IV.    CONCLUSION

For the reasons set forth above, General Citrus' motion for summary judgment on the issue of liability is granted in part as to Count I and denied as to Count III; the Ury Defendants' motion for summary judgment is denied; and the Remien Defendants' motion for summary judgment is denied as to Count I and granted as to Count II. It is so ordered.

ENTERED:

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: February 26, 2009**

33